**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GARY LYNELL PENNINGTON, | ) | |
| | ) | Civil Action No. 11-905 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | District Judge Arthur J. Schwab |
| | ) | |
| TABB BICKELL, Superintendent; THE | ) | Magistrate Judge Cynthia Reed Eddy |
| DISTRICT ATTORNEY OF | ) | |
| ALLEGHENY COUNTY; and the | ) | |
| ATTORNEY GENERAL FOR THE | ) | |
| STATE OF PENNSYLVANIA, | ) | |
| | ) | |
| Respondents. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.     RECOMMENDATION**

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied.  It is further recommended that there is no basis upon which to grant a certificate of appealability.

**II.     REPORT**

Petitioner, Gary Lynell Pennington, a state prisoner incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in connection with his conviction for Murder in the First Degree.  For the reasons that follow, the Petition should be denied.

**A. Relevant Factual and Procedural History**

On May 25, 2002, Petitioner moved in with Irene Bonner at her home in the Northview Heights section of the city of Pittsburgh.  Bonner testified that, later that same night, Petitioner asked

her to call for a jitney so he could go and get a case of beer.  After he left, Larry Miller, the victim and a friend of Bonner, approached her outside her home and asked her for a can of beer.  She told him that he would have to ask Petitioner as it was his beer.  Shortly thereafter, Petitioner returned and Miller came into the house and asked him for a beer.  Petitioner refused and the two men started to argue.  When the confrontation began to escalate, Bonner stepped in and gave Miller and his friend each a beer and told them to leave.  Petitioner remained angry for the remainder of the night and told Bonner not to let those people back or somebody was going to die.

The next day, Petitioner left the house around 10:00 a.m. and returned home in the afternoon.  He still was angry about the beer incident and was upset about his wallet, which he claimed to have lost on the bus earlier in the day.  He told Bonner that he was going to the neighborhood store, Northview Heights Deli, to purchase a lottery ticket.  Miller, the victim, worked at the deli and Bonner told Petitioner not to get into it with Miller because all of Miller's friends were in the area and she was afraid someone would get hurt.

Lorenzo Pryor, the Deli manager, testified that Petitioner entered the Deli at approximately 6:00 p.m. and approached the lottery register where Pryor asked if he needed help.  Petitioner said no and left.  At the time, Miller had been standing at the lottery station but Petitioner did not speak to him.  Shortly thereafter, another employee, Elijah Whitley, twice took garbage outside to the dumpster and both times observed Petitioner in the nearby vicinity.

At 8:00 p.m., Pryor and Whitley closed the store and exited the building where they observed Petitioner approach Miller, who was standing on the sidewalk waiting for a ride.  Pryor heard Petitioner tell Miller that he was insulted over the incident that had occurred the night before

regarding the beer and the fact that Miller had called him a punk.  He heard Miller apologize to Petitioner and, as the men were talking, Pryor observed a small steak knife in Petitioner's sleeve.  As Pryor started to walk away, he saw Petitioner pull a butcher knife from his other sleeve and turn and stab the victim in the chest.  The butcher knife broke and the handle fell to the ground and Miller said, "He stabbed me."

Both Pryor and Whitley testified that Miller knocked Petitioner to the ground and grabbed the steak knife from him.  Miller began sticking Petitioner with the steak knife and Pryor yelled not to kill him.  Miller then got up and began to stagger backward as blood started running from his mouth. Petitioner grabbed the steak knife and ran from the scene.  Miller fell to the ground where he died.

Bonner observed the confrontation between Miller and Petitioner from across the field.  She observed the knife in Petitioner's hand immediately following the incident.  When Petitioner approached Bonner after the incident, he was covered in blood and said, "I told him not to fuck with me."  Later that same night, police saw Petitioner in a vacant lot less than a mile from the Deli. Petitioner initially ran but officers found him hiding under a vehicle and placed him in custody.  His clothes were blood-stained and he had a small laceration on the side of his face and a cut on his finger.  Police recovered the knife handle and knife blade from the sidewalk at the scene.  Bonner identified the knife as one given to her by her Grandmother.

Petitioner testified on his own behalf and acknowledged that a confrontation occurred between him and the victim when he refused to give the victim any beer.  He claimed that Miller threatened him and denied that he ever threatened to kill anyone while talking to Bonner.  Petitioner asserted that Bonner asked him to pick up some potato chips for her so he stopped at the Deli.

Petitioner said that he bought his items and then returned home. He claimed that he later went to the bus stop across the street from the Deli to catch the bus to his sister's house to retrieve his wallet. Because he missed the bus, he thought it would be a good time to "straighten" things out with Miller. He denied that he had any knives on his person. Petitioner waited about 30 minutes for the victim to come outside and asked to speak to him about the incident from the previous night. According to Petitioner, Miller dropped the coat he had been holding, revealing a knife in his hand. Petitioner said that as he turned to run, Miller kicked him and climbed on top of him and tried to stab him. Petitioner stated that he grabbed the knife around the blade and was able to pull it from Miller's hand and it fell by his shoulder. Petitioner stated that he was able to get the knife, which he "poked" at Miller who then got to his feet and began backing away. Petitioner then ran from the scene carrying the knife, which he threw as he was fleeing.

Following the trial, the jury convicted Petitioner of murder in the first degree murder. Immediately after the trial concluded, Defense Counsel spoke with the jurors, one of whom indicated that she had done some independent legal research on the internet. Counsel moved for a mistrial and on August 11, 2003, a hearing on the motion was held and the juror in question testified. After reviewing the parties' briefs, the Court ultimately denied the motion for mistrial. On September 30, 2003, the court imposed the mandatory sentence of life imprisonment without parole.

A timely notice of appeal was filed with the Superior Court of Pennsylvania, after which Petitioner sought to waive counsel and represent himself. Following a hearing in which it was determined that he knowingly and voluntarily waived his right to counsel, Petitioner was permitted to proceed *pro se*. Petitioner raised the following four issues in his appeal.

1. Did the Coroner's Office violate the Fourth Amendment's command by signing and issuing a criminal complaint after a warrantless arrest by the police since a coroner, who is not a judicial officer prior to holding an inquest, is essentially an arm of the prosecution?

2. Was the Coroner's Inquest, which formed the basis of the Information, violative of the due process and equal protection clauses of the Fourteenth Amendment considering all the attending and existing circumstances?

3. Does the state's Information Clause and the Formal Notice and Due Process clauses of the federal and state constitutions require a valid preliminary proceeding prior to the District Attorney filing an information with the trial court to give it jurisdiction of appellant's case?

4. Was it equivalent to having written jury instructions, and thereby a violation of state law, where a juror researched on the internet the definitions of different degrees of homicide, of unknown origin, while on recess during deliberations?

The trial court filed its Opinion denying Petitioner's claims on May 5, 2005 (ECF No. 11-1, pp. 27-30). On October 30, 2006, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence (ECF No. 11-3, pp. 46-47). The Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal on July 6, 2007 and on October 9, 2007, the United States Supreme Court denied his Petition for Writ of Certiorari.

On November 16, 2007, Petitioner filed a petition for relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. § 9542. The court appointed counsel, who filed an amended petition on February 5, 2009, in which he raised the following claims.

1. Trial counsel was ineffective under the state and federal constitutions in failing to recognize, investigate and correct a material discrepancy in the petitioner's medical report which incorrectly reported injury to his right hand and which was used by the prosecutor to unfairly disparage the petitioner's testimony. Counsel was also ineffective in stipulating to an incorrect and misleading medical report, in neglecting to produce the testimony of the treating nurse who would have corroborated petitioner's testimony that only his left hand had been wounded in the altercation, and

in failing to object to improper and highly prejudicial prosecutorial closing argument which relied on the incorrect medical report.

2. Trial counsel was ineffective in failing to object to the prosecutor's improper and misleading closing argument, which asserted that Mr. Pennington had only been wounded in his right hand when the stipulated medical evidence was to the contrary.

Following an evidentiary hearing held on August 3, 2009, the Court denied the PCRA Petition by order dated September 21, 2009. Petitioner filed a timely notice of appeal and on October 28, 2009, the post-conviction court issued its opinion (ECF No. 12-1, pp. 34-38). On July 8, 2010, the Superior Court affirmed the judgment of the PCRA court (ECF No. 12-3, pp. 38-49). Petitioner filed a Petition for Allowance of Appeal, which was denied by the Supreme Court of Pennsylvania on December 17, 2010.

Petitioner filed his Petition for a Writ of Habeas Corpus with this Court on July 8, 2011 wherein he raises the following claims.

1.    Conviction obtained by use of unlawful criminal process (structural defect).

2.    Conviction obtained by a proceeding in a tribunal without jurisdiction (structural defect).

3.    Conviction obtained through use of unconstitutional accusation (structural defect).

4.    Conviction obtained through use of juror misconduct.

5.    Denial of effective assistance of counsel.

Petitioner presented these claims in a timely manner to the Pennsylvania Courts in his direct appeal and PCRA proceedings.

**B. Standard of Review**

In describing the role of federal habeas corpus proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"Clearly established Federal law" should be determined as of the date of the relevant state-court decision and is limited to the record that was before the state court that adjudicated the claim on the merits.  Greene v. Fisher, ___ U.S. ___, 132 S.Ct. 38 (2011); Cullen v. Pinholster, 563 U.S. ──, 131 S.Ct. 1388, 1398 (2011).  A state-court decision is "contrary to" clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.  A state-court decision 'involves an unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  Williams, 529 U.S. at 407.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ──, ──,131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786–87.

A recent decision of the Supreme Court illustrates the deference that the federal courts must accord to state court decisions. In Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855 (May 3, 2010), the Supreme Court reviewed the Court of Appeals for the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. The federal district court granted a writ of habeas corpus and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity. The Supreme Court reversed.

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of ... clearly established Federal law." § 2254(d)(1).

Lett, 130 S.Ct. at 1862. The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision - or, for that matter, the trial judge's declaration of a mistrial - was right or wrong. The latter question, in particular, is a close one. As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial. The Michigan Supreme Court declined to accept this

confession of error, <u>People v. Lett</u>, 463 Mich. 939, 620 N.W.2d 855 (2000), and in any event - for the reasons we have explained - **whether the trial judge was right or wrong is not the pertinent question under AEDPA.**

*Id*. at 1865, n. 3 (emphasis added).[1] *See also* <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.' ").

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." <u>Campbell v. Vaughn</u>, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id*. (citing <u>Marshall v. Lonberger</u>, 459 U.S. 422, 433 (1982)).

### C. Review of Petitioner's Claims

1.    <u>Unlawful Criminal Process</u>

In his first three claims, Petitioner asserts errors regarding his pre-conviction process. Specifically,  he argues that the Coroner is an arm of the prosecution, and therefore, his actions of issuing the criminal complaint violated the Fourth Amendment's requirement of a neutral and detached magistrate and that his action of sitting as the hearing officer at an inquest in *lieu* of a

---

1. *See also* <u>Harris v. Ricci</u>, 607 F.3d 92, 99 (3d Cir. 2010) (explaining and applying <u>Lett</u>).

preliminary hearing violated his rights to due process and equal protection. In his third issue, he argues that the criminal information that was issued following the inquest was invalid as a result of the lack of authority of the coroner, thus violating his Sixth Amendment right to be informed of the nature and cause of the accusation.

Following conviction, a defendant is not entitled to federal habeas corpus relief based on defects that may have occurred prior to trial. *See, e.g.*, United States v. Mechanik, 475 U.S. 66, 73 (1986) (holding that jury's verdict rendered harmless any conceivable error in grand jury rule meant to ensure probable cause existed to believe a defendant was guilty); United States v. Console, 13 F.3d 641, 672 (3d Cir. 1993) (holding that the jury's guilty verdict rendered any prosecutorial misconduct before the indicting grand jury harmless); Brooks v. Tansy, 952 F.2d 409 (Table) (10th Cir.) (holding that, even assuming petitioner had a right to a second preliminary hearing, his conviction after trial made this error harmless), *cert. denied*, 504 U.S. 977 (1992); Thomas v. Kemp, 796 F.2d 1322, 1326 (11th Cir. 1986) (absence of counsel at preliminary hearing harmless error); Moses v. Helgemoe, 562 F.2d 62, 65 (1st Cir. 1976) (same).

"[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." Mechanik, 475 U.S. at 70. Petitioner was adjudged guilty beyond a reasonable doubt following a jury trial. Consequently, any claim challenging the pre-trial probable cause determination is rendered moot by the conviction.

Moreover, due process of law is satisfied when a defendant is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional

procedural safeguards.  <u>Frisbie v. Collins</u>, 342 U.S. 519, 522 (1952).  Petitioner received adequate

notice that he was charged with Criminal Homicide at the Coroner's Inquest.  Moreover, a Criminal

Information setting forth the elements of the offense of Criminal Homicide was filed in the Court of

Common Pleas of Allegheny County and served on Petitioner.  It is well-settled that by including the

elements of the offense, an indictment informs the defendant of the charge against him.  <u>Hamling v.

United States</u>, 418 U.S. 87, 117 (1974).  The language in the Criminal Information (ECF No. 12-7,

p. 4) meets the requirements of due process set forth above.  As such, it is clear that Petitioner is not

entitled to relief with respect to his first three claims.

2.      <u>Juror Misconduct</u>

Petitioner next claims that the trial court erred in failing to grant him a new trial based on

juror misconduct.  Specifically, following his conviction, it came to the attention of defense counsel

that one of the jurors had researched the definitions of murder and homicide on her own using the

internet.  Petitioner argues that this conduct was the equivalent of submitting written instructions to

the jury, which is not permissible under Pennsylvania law.

> Where a jury is permitted to take with them written instructions during their
> deliberations, a question may arise as to the appropriate application of the written
> instruction when resolving an issue in the cause [sic]. In such a case, it is highly
> probable the jury would resort to its interpretation of the written instructions in
> reaching its verdict. Where the jury is required to rely upon the oral instructions given
> by the judge in his charge, if disagreement arises concerning the oral instructions, it is
> more likely that the jury would seek further instructions from the judge to resolve the
> question. When an issue is resolved by further instructions from the court, that
> procedure insures that misconceptions are not permitted to infect the deliberative
> process. On the other hand, when a jury is left to its own devices to interpret a written
> instruction, the possibility of a misconception is significantly enhanced. Moreover,
> the submission of written instructions would tend to encourage the jury to ignore the
> court's general instruction and focus upon the written instructions supplied to them.

This undue emphasis on portions of the charge has the potential of undermining the integrity of the deliberative process.

Commonwealth v. Oleynik, 524 Pa. 41, 46-47, 568 A.2d 1238, 1241 (1990).

This rule of law is based on Pennsylvania Rule of Criminal Procedure 646, Material Permitted in Possession of the Jury, which provides that the jury may take with it such exhibits as the trial judge deems proper. Pa. R. Crim. P. 646(a). The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice *per se* and the error is harmless. Commonwealth v. Strong, 575 Pa. 433, 439, 836 A.2d 884, 888 (2003).

Petitioner raised this claim on direct appeal where the state courts made the following determination.

Defendant lastly avers that he is entitled to a new trial due to juror misconduct. A review of the record, however, reveals that Defendant is not entitled to a new trial on this basis.

Under Pennsylvania law, a juror, as a general rule, may not impeach the jury's verdict after the jury has been discharged. A narrow exception to this general rule, however, exists where the post-trial testimony of a juror relates to extraneous influences that may have affected the jury during deliberations. In such a circumstance, the juror may testify as to the existence of the outside influence, but not to the effect such outside influence had on jury deliberations.

Once competent evidence of an outside influence on jury deliberations is established, the trial court must objectively determine whether the outside influence prejudiced a defendant's right to a fair trial. In undertaking this evaluation, a Court must consider: (1) whether the outside influence related to a central issue in the case; (2) whether the outside influence provided the jury with information not presented at trial; and (3) whether the outside information was inflammatory in nature. Moreover, the burden to establish prejudice rests squarely with the defendant.

Instantly, subsequent to the rendering of the jury's verdict, defense counsel became aware that a juror had conducted outside research concerning the definitions of first, second and third degree murder. Defense counsel thereafter made both an oral and written motion for new trial. On August 11, 2003, an evidentiary hearing was conducted to address said motions.

At the evidentiary hearing, the juror at issue testified that she accessed the definitions of first, second and third degree murder on the internet at her home during a recess in deliberations. The juror testified that the definitions she found were the same as those given by this Court during final instructions. Finally, the juror testified that she did not print out the definitions from the internet site nor did she share any of this information with other jurors.

Based on the above, this Court ruled that Defendant failed to establish prejudice from the specific actions of the juror in this case and denied Defendant's request for a new trial. This Court's decision was based on the fact that the uncontroverted testimony from the juror established that the information she received from the internet was the same as that provided by this Court during final instructions. Moreover, the information was not inflammatory or emotional and cannot objectively establish prejudice. Accordingly, Defendant's right to a fair trial was not compromised.

Trial Court Opinion dated May 5, 2005 at 3-5 (internal citations omitted). The Superior Court adopted this holding. Superior Court Memorandum Opinion dated October 30, 2006 at 1.

As stated above, this Court is required to review Petitioner's claims in accordance with the standard of review set forth in AEDPA. Specifically, in order to be entitled to relief, Petitioner must show that the Pennsylvania Court's decision refusing to grant a new trial was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1398 (2011) (internal citations omitted). The petitioner carries the burden of proof. *Id.*

A state court decision fails the "contrary to" prong of AEDPA if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts. McMullen v. Tennis, 562 F.3d 231, 236 (3d Cir. 2009) (quotation and citations omitted). Petitioner cannot show that he is entitled to relief under the contrary to prong of AEDPA as the Supreme Court specifically has rejected a *per se* rule disallowing the jury to be provided with written jury instructions. *See* Haupt v. United States, 330 U.S. 631, 643 (1947) (holding that allowing the jury to have a typewritten copy of the court's charge did not warrant the inference of unfairness or irregularity in the trial). Moreover, the federal courts and the majority of the states favor the submission of a written charge. *See* Propriety and Prejudicial Effect of Sending Written Instructions With Retiring Jury In Criminal Cases, 91 A.L.R.3d 382 (1979).

A state court ruling is considered an "unreasonable application" if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply. Harris v. Ricci, 607 F.3d 92, 96 (3d. Cir. 2010). The Superior Court decision is not an unreasonable application of clearly established federal law. In this regard, the Supreme Court has held as follows.

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial

occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that . . . held in this case.

Smith v. Phillips, 455 U.S. 209, 217 (1982).

If the court has reason to believe that jurors have been exposed to prejudicial information, the trial judge is obliged to investigate the effect of that exposure on the outcome of the trial. United States v. Console, 13 F.3d 641, 669 (3d Cir. 1993). A new trial is warranted if the defendant likely suffered "substantial prejudice" as a result of the jury's exposure to the extraneous information. United States v. Lloyd, 269 F. 3d 228, 238 (3d Cir.1991). Factors a court should use in determining whether there was substantial prejudice include: 1) whether the extraneous information relates to one of the elements of the case that was decided against the party moving for a new trial; 2) the extent of the jury's exposure to the extraneous information; 3) the time at which the jury receives the extraneous information; 4) the length of the jury's deliberations and the structure of the verdict; 5) the existence of instructions from the court that the jury should consider only evidence developed in the case; and 6) the volume of incriminating evidence. Lloyd, 269 F.3d at 241 (internal quotation omitted).

Application of these factors to the instant case clearly reveals that the state courts' determination is not an unreasonable application of federal law. Only one juror was involved and she merely researched instructions that she was otherwise given by the trial judge. She did not discuss her research with any other jurors, nor did she speak about it with the other jurors during deliberations. Before deliberations began, the jury was instructed to base their decision strictly on

the evidence.  Finally, there was an overwhelming volume of incriminating evidence against Petitioner. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 112 (2009) (internal quotation marks omitted).  As Petitioner has not demonstrated that the state courts determination is contrary to, or an unreasonable application of, clearly established federal law, he is not entitled to habeas corpus relief based on this claim.

3.     Ineffective Assistance of Counsel

Petitioner's last claim alleges ineffective assistance of counsel.  The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).  *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (holding that the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687.  The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688.  The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689.  A defendant is not entitled to relief

unless he makes both showings. *Id*. at 687. Moreover, "[a] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Id*. at 694. The Strickland standard applies equally to appellate counsel. Smith v Robbins, 528 U.S. 259, 285 (2002).

In analyzing Petitioner's claims under the two-part test announced in Strickland, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel under Strickland is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations. Berryman, 100 F.3d 1089, 1095 (3d Cir. 1996). In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies. *Id*. Likewise, a state court's determination that a decision was a tactical one is a question of fact. *Id*.

The Supreme Court recently reiterated the difficulty of prevailing on an ineffectiveness claim on habeas review.

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 785 (2011) (internal quotations and citations omitted). The Court further instructed:

Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S.Ct. at 788 (internal quotations and citations omitted).

Petitioner raised two claims of ineffective assistance in his PCRA proceeding. First, he asserted that his trial counsel rendered ineffective assistance by failing to recognize, investigate or correct a material discrepancy in appellant's medical records and in admitting those medical records into evidence, where the medical records erroneously described an injury to appellant's right hand and where the records were then utilized by the prosecutor to misleadingly and unfairly disparage appellant's testimony regarding defensive lacerations to his left hand. The Superior Court made the following determination with respect to this claim.

In his first issue, Appellant directs our attention to his trial testimony in which he stated he had stabbed Victim out of self-defense and suffered an injury to his left hand after grabbing Victim's knife. Despite this testimony, Appellant insists counsel

stipulated to the content of medical records, indicating injuries to both the left and right hand. Appellant complains the records erroneously mentioned a right hand injury, and the prosecutor utilized this error to impeach Appellant's testimony. Appellant proclaims counsel should not have stipulated to the content of the erroneous records, and counsel should have corrected the inconsistencies in the records following the stipulation. Appellant submits counsel's failure to recognize or correct the inconsistencies undermined the credibility of Appellant's self-defense claim. Appellant maintains counsel had no reasonable basis for failing to recognize or correct the inconsistencies in the medical records, and Appellant suffered prejudice as a result of counsel's inaction.

Appellant claims counsel compounded this error by failing to locate Ms. Washington, the nurse who treated Appellant following his arrest. Appellant argues he provided counsel with Ms. Washington's name prior to trial, and counsel prepared a subpoena for Ms. Washington; nevertheless, counsel did not secure her appearance at trial. Appellant suggests Ms. Washington's testimony was "vital" to his claim of self-defense, because she would have confirmed he had sustained wounds only to his left hand during the altercation. Appellant concludes counsel was ineffective for failing to recognize, investigate, or correct the discrepancies in the medical records. We disagree.

.  .  .

Instantly, Appellant provided extensive testimony regarding his altercation With Victim. On direct examination, Appellant claimed Victim attempted to stab Appellant in the face with a knife. Appellant "reached up and grabbed the knife around the blade." With his other hand, Appellant "grabbed [Victim] by the knuckle" and "squeezed his hand at the same time." On cross-examination, the Commonwealth questioned Appellant about the resulting hand injuries:

[COMMONWEALTH]:  You received a cut on your right hand, right ring finger.

[APPELLANT]:  Yes. I got that from pulling the knife by the blade.

[COMMONWEALTH]:  So you reached up and grabbed [the knife], is that your testimony?

[APPELLANT]:  Yes.

[COMMONWEALTH]:  You indicated in your testimony, correct me if I'm wrong, you indicated that you reached up and grabbed it with your left hand.

[APPELLANT]:  Yes.

[COMMONWEALTH]:  But the wound was on your right hand.

[APPELLANT]:  No, my left hand.

[COMMONWEALTH]:  I thought your testimony was previously that the wound was on your right hand?

[APPELLANT]:  No, my left hand.

Jill Fox, the emergency medical technician who treated Appellant after the altercation, also testified regarding Appellant's injuries.  Ms. Fox indicated Appellant had suffered "a small laceration on the middle finger of the right hand."  Ms. Fox cleaned up the blood and put a Band Aid on the wound.  Ms. Fox also testified the wound was approximately two (2) centimeters long.

Additionally, the parties stipulated to the content of Appellant's medical records. The "medical problem list" described a "one inch laceration [on the] the left fourth finger [palm] side."  A subsequent progress note, however, says "right ring finger laceration, tetanus shot given.  Wound edges well approximated.  Assessment:  Laceration of the [palm] side of the right ring finger."

Here, the record demonstrates some discrepancies regarding Appellant's hand injury.  Nevertheless, Appellant has not adequately demonstrated how these discrepancies regarding the location of the hand wound adversely affected his self-defense claim.  Moreover, the Commonwealth presented overwhelming evidence to counter Appellant's self-defense claim.  Commonwealth witnesses described Appellant's anger with Victim over an incident that had occurred the day before the murder.  Commonwealth witnesses also explained how Appellant confronted Victim shortly before the stabbing.  After the two men discussed the prior day's incident, Victim apologized to Appellant.  Appellant appeared to accept the apology, but moments later, he took out a knife and stabbed Victim in the chest.  In light of this evidence, Appellant has failed to prove he suffered unfair prejudice due to counsel's failure to correct the discrepancies in the medical records.  Based upon the foregoing, Appellant is not entitled to relief on his first claim.

Superior Court Memorandum Opinion dated July 8, 2010 at 6-9 (internal citations omitted).

The Supreme Court has recognized that the mere failure to file a trial motion does not

constitute *per se* ineffective representation.  <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986).  Rather,

to demonstrate actual prejudice under the second prong of the Strickland test, a petitioner must prove that the claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence. *Id*. at 375. The Superior Court determined that there was no reasonable probability that the verdict would have been different due to the overwhelming evidence of Plaintiff's guilt. Thus, Petitioner had failed to show the necessary prejudice prong of Strickland. Here, on federal review, Petitioner has failed to show that this determination is contrary to, or an unreasonable application of, clearly established federal law. As such, he has failed to show that he is entitled to relief with respect to his first ineffectiveness claim.

Petitioner's second ineffectiveness claim asserts that trial counsel was ineffective in failing to object to the prosecutor's improper and misleading closing argument, which incorrectly asserted that appellant had only been wounded in his right hand when the stipulated medical evidence was to the contrary.

As an initial matter, the Court notes that allegations of prosecutorial misconduct are reviewed under the standards for fundamental fairness as guaranteed under the Due Process Clause. Darden v. Wainwright, 477 U.S. 168, 181 (1986); Smith v. Phillips, 455 U.S. 209, 219 (1982). To constitute a due process violation, the prosecutorial misconduct must be " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " United States v. Bagley, 473 U.S. 667, 676 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)). The relevant question is whether the prosecutors' comments so infected the trial with unfairness so as to make the resulting conviction a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). In making this determination, the statements or conduct at issue cannot be viewed in isolation. Rather, a court must

assess the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution. United States v. Young, 470 U.S. 1, 11 (1985). In other words, "the court must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *Id*. Moreover, a prosecutor's statement regarding the credibility of a witness can constitute grounds for reversal only if the defendant can show that he was prejudiced by those comments. United States v. Swinehart, 617 F.2d 336, 339 (3d Cir. 1980). A determinative factor in this analysis is whether the prosecutor's comments suggested that he or she had knowledge of evidence other than that which was presented to the jury. Buehl v. Vaughn, 166 F.3d 163, 176 (3d Cir. 1999) (citations omitted).

In addressing this issue, the Pennsylvania Superior Court found as follows.

In his second issue, Appellant acknowledges the discrepancies in the record regarding whether he suffered a cut on his right or left hand. Despite these discrepancies, Appellant Insists the prosecutor's closing argument referred to a cut on the right hand and ignored all evidence of a wound on the left hand. Appellant complains the prosecutor effectively gave a closing argument that was contrary to the evidence of record, and counsel had no reasonable basis for failing to object to the prosecutor's prejudicial statements. But for counsel's failure to object to the prosecutor's closing argument, Appellant insists there was more than a reasonable probability that his self-defense claim would have succeeded. Appellant concludes counsel was ineffective for failing to object to the prosecutor's allegedly improper closing argument. We disagree.

In considering a prosecutorial misconduct claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.

Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [the defendant]so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct,

however, will not be found where comments were based on evidence or proper Inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

A new trial is required only when a prosecutor's improper remarks are unduly prejudicial, *i.e.*, when they are of such a nature or delivered in such a manner that they may reasonably be said to have deprived the defendant of a fair and impartial trial.

A prosecutor has great discretion during closing argument. Indeed, closing argument is just that: argument. It is proper for the prosecutor to argue that the evidence proves the defendant is guilty of the offense at issue. A prosecutor, however, must limit statements to facts in evidence and reasonable inferences therefrom and must not express personal opinions on a defendant's guilt or credibility.

Instantly, the prosecutor made the following statement during his closing argument:

Yet I became confused, maybe you did, too, when [Appellant] tried to explain actually what occurred on the ground [during his struggle with Victim].

[Appellant] tells you that he grabs the knife blade with his left hand, is able to put pressure on the victim's knuckles to try to shake the knife out of [Victim's] hand, yet it is [Appellant's] right hand that has the cut. [Appellant] tells you that [Victim], who was six inches taller than him and almost 30 pounds heavier than him, and actually six years younger than him, [Appellant] is able to wrestle this knife away from [Victim] in this manner as he described to you. And [Appellant] says that he grabs the knife with his right hand and that somehow thrusts or pokes the victim in [his] chest.

Does the uncontroverted evidence support that theory? No, It does not.

Again, [Victim] was younger, taller, was heavier. Secondly, [Appellant] says that he grabs the knife with his left hand but in fact the cut is on his right hand. It doesn't make sense. It doesn't match. It is not what happened that night.

Here, the prosecutor's statements regarding the injury to Appellant's "right" hand were based upon evidence of record. Specifically, Ms. Fox's testimony indicated a laceration on Appellant's right hand. Likewise, the progress notes in Appellant's medical records also detailed a laceration on Appellant's right hand. Under these circumstances, the prosecutor argued certain facts in evidence. We conclude there is no arguable merit to Appellant's claim of ineffectiveness for failing to object to the prosecutor's closing argument on this ground. Accordingly, we affirm the order dismissing Appellant's PCRA petition.

Superior Court Memorandum Opinion dated July 8, 2010 at 9-12 (internal quotations and citations omitted).

As noted by the Superior Court, the prosecutor's argument was properly grounded in the trial evidence and was a fair response to the defense's argument. Therefore, Petitioner has not shown the first requirement, *i.e.*, that any objection from trial counsel would have been sustained. Failure to make the required showing of deficient performance defeats his ineffectiveness claim and the Court need not determine prejudice. Strickland, 466 U.S. at 700. More importantly, Petitioner has failed to show that the Superior Court's ruling is contrary to, or an unreasonable application of, clearly established federal law. As such, he has failed to show that he is entitled to relief with respect to his second ineffectiveness claim.

### C. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. 2254(c)(2). Here, the

record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

## III.  <u>CONCLUSION</u>

Based on the discussion above, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied. It is further recommended that there is no basis upon which to grant a certificate of appealability.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. ' 636(b)(1)(B) & (C)] and the Local Rules of Court, the parties shall have fourteen days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

<u>/s Cynthia Reed Eddy</u>
Cynthia Reed Eddy

United States Magistrate Judge

April 5, 2012

Gary Lynell Pennington
FN-4639
S.C.I. Huntingdon
1100 Pike Street
Huntingdon, PA 16654-1112